1

2

3

4

5

6                    IN THE UNITED STATES DISTRICT COURT

7                    FOR THE DISTRICT OF ARIZONA

8

9    John Mawhinney,                    )    No. CV 06-00444-CKJ(JCG)
                                        )
10            Plaintiff,                )    **REPORT AND RECOMMENDATION**
                                        )
11   vs.                                )
                                        )
12                                      )
     Jo Anne B. Barnhart,               )
13                                      )
              Defendant.                )
14                                      )
                                        )
15   _____)

16

17          Plaintiff filed this action for review of the final decision of the Commissioner for

18   Social Security pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). The case has been referred

19   to the United States Magistrate Judge pursuant to the Rules of Practice of this Court.

20          Pending before the Court is a motion for summary judgment filed by Plaintiff on

21   November 30, 2006 (Doc. No. 8) and a cross-motion for summary judgment filed by

22   Defendant on December 29, 2006. (Doc. No. 9.)  Defendant responded to Plaintiff's motion

23   on December 29, 2006 (Doc. No. 10) and Plaintiff filed his Reply on January 12, 2007.

24   (Doc. No. 12.)

25          The Magistrate Judge recommends that the District Court, after its independent

26   review, grant Defendant's Motion for Summary Judgment (Doc. No. 9), and deny Plaintiff's

27   Motion for Summary Judgment.  (Doc. No. 8).

28

## PROCEDURAL HISTORY

Plaintiff was a pilot. Due to certain medical conditions he can no longer fly. Plaintiff filed an application for social security disability insurance benefits on December 19, 1997, alleging that he had suffered from a disability due to vertigo since March 26, 1996. (Tr. 81-84, 94-99.)

The Social Security Administration (SSA) denied his application initially and again upon reconsideration. (Tr. 62, 63.) Plaintiff requested review, and on March 10, 1999 appeared with counsel at a hearing before Administrative Law Judge (ALJ) Norman R. Buls. (Tr. 74, 34-60.) The ALJ found Plaintiff was not entitled to a period of disability or disability insurance benefits under sections 216(i) and 223, respectively, of the Social Security Act. (Tr. 14-20.) The ALJ found that Plaintiff had no exertional limitations but had a non-exertional limitation consisting of minor episodes of vertigo on an irregular basis which limited his ability to operate machinery that required a great deal of care. (Tr. 14-20.) The ALJ also found, based on the testimony of a vocational expert, that Plaintiff could perform his past relevant work ("PRW") as a state senator, and in the alternative, other jobs in the local and national economy, such as ticket agent or security guard. (Tr. 17.) The ALJ therefore concluded that Plaintiff was not disabled. (Tr. 18.) Plaintiff appealed the ALJ's decision, and the Appeals Council denied review, making the decision of the ALJ the final decision of the Commissioner. (Tr. 5-6.) *See* 20 C.F.R. §§ 404.981.

Plaintiff filed a federal court action seeking judicial review pursuant to 42 U.S.C. § 405(g). On April 18, 2005, the United States District Court for the District of Arizona held that the ALJ's finding that Plaintiff could perform the type of work he did in his PRW as a state senator was based on the testimony of a vocational expert, but that the transcript indicated that the vocational expert was not prepared to discuss Plaintiff's prior employment as a state senator. The District Court therefore concluded that the ALJ's finding was not supported by substantial evidence and remanded the matter to the Commissioner for further proceedings. (Tr. 366.) The Appeals Council issued a remand order on June 20, 2005. (Tr. 634.)

1    In a decision dated May 25, 2006, the ALJ determined that Plaintiff had a full range
2    of exertional activity except as limited by minor episodes of vertigo on an irregular basis and
3    need to avoid exposure to operating machinery without a great deal of care. (Tr. 336.) The
4    ALJ again concluded, based on the testimony of a vocational expert, that Plaintiff could
5    perform his PRW as a state senator given his residual functional capacity. (Tr. 337.) The
6    ALJ also relied on the testimony of a vocational expert in concluding that, in the alternative,
7    Plaintiff could make a vocational adjustment to other kinds of work, such as telephone
8    solicitor or dispatcher. (Tr. 338.) The ALJ therefore concluded that, independent of
9    Plaintiff's ability to work as a state senator, Plaintiff was "not disabled" because Plaintiff was
10   capable of making a successful adjustment to work that exists in significant numbers in the
11   national economy. (Tr. 338.) Plaintiff appealed the ALJ's decision and the Appeals Council
12   denied review, making the decision of the ALJ the final decision of the Commissioner. (Tr.
13   323-28.) *See* 20 C.F.R. §§ 404.981.

14   Plaintiff filed a complaint in U.S. District Court appealing the Commissioner's final
15   decision. (Doc. No. 1.) Plaintiff filed the instant motion for summary judgment on
16   November 30, 2006 (Doc. No. 8), challenging the ALJ's findings that: (1) Plaintiff's previous
17   employment as a state senator was PRW; (2) Plaintiff had the residual functional capacity
18   to perform his past work as a state senator; and (3) Plaintiff had transferable skills or the
19   ability to perform other work with only "little or no vocational adjustment." Defendant filed
20   a response and cross-motion for summary judgment on December 29, 2006. (Doc. No. 9.)
21   Plaintiff replied to Defendant's response on January 12, 2007. (Doc. No. 12.)

22                                   FACTUAL BACKGROUND
23   Claimant's Work History

24   Plaintiff was born on May 27, 1937, and is 70 years of age. (Tr. 81.) He has 14 years
25   of education, including two years of college, and officer candidate school in the United States
26   Air Force undergraduate pilot training program. (Tr. 720.) Plaintiff was a pilot in the Air
27   Force from 1962 to 1966. (Tr. 38.) He worked in the airline industry from 1966 until 1996
28   as a pilot flight engineer and as a first officer (or co-pilot). *(Id.)* The last job he had was as

1   a first officer flying 747 airplanes from the United States to Asia. (Tr. 37.) In addition,

2   Plaintiff was elected and served as an Arizona state senator from 1979 to 1991. (Tr. 40.)

3   During this period, Plaintiff would take a leave of absence from the airlines from January to

4   May or June, while the Arizona legislature was in session. (Tr. 40.) The annual pay for a

5   State Senator at the time was $6,000 per year. *Id.*

6       In the summer of 1996, the Federal Aviation Administration ("FAA") determined that

7   Plaintiff was disabled under its rules and regulations and Plaintiff lost his FAA certification.

8   (Tr. 34, 732.) Since that time, Plaintiff has not worked, although he was appointed to a

9   transportation board and to two water boards. (Tr. 40, 722.)

10   Claimant's Medical History

11       In March 1996, during a flight from Los Angeles to Sydney, Australia, Plaintiff had

12   an acute attack of vertigo which was accompanied by nausea, vomiting and cold sweats. The

13   vertigo lasted for three days on this first occurrence. (Tr. 733.)  Plaintiff claims that he

14   experiences two types of vertigo attacks. The first type consists of a sensation that the room

15   slides to the left or that the whole room is spinning for awhile, but then it stops. There is no

16   pre-cursor or indication that such an attack is about to occur. (Tr. 43.) The second type is

17   more severe, producing a sensation that the whole world is spinning around, and causes

18   nausea, chills and dizziness that may last for three or four days. (Tr. 44.)

19       Dr. Welsh has been Plaintiff's personal doctor since May 15, 1992. (Tr. 160, 384.)

20   Plaintiff saw Dr. Welsh for treatment of his vertigo in March 1996 after his first attack. (Tr.

21   151.)  Dr. Welsh requested that Plaintiff go through a flight simulator test before returning

22   to work.  (Tr. 151.)  Plaintiff took the flight simulator test, which is designed to induce

23   vertigo, on June 10, 1996.  It brought on vertigo, nystagmus[1] and nausea in Plaintiff after

24   several maneuvers and a left turn. (Tr. 144, 151, 734.)  On October 21, 1996, Dr. Welsh

25   opined that Plaintiff's condition appeared to be permanent and that it was not safe for

26   Plaintiff to fly.  (Tr. 151.)

27

28

[1]Nystagmus is  involuntary rhythmic movement of the eyes. *Mosby's Medical Dictionary* 1091 (4th ed., Mosby 1994).

1     Dr. Welsh referred Plaintiff to Dr. Stuart Snider, a neurologist whom Plaintiff visited

2  three times for complaints related to vertigo. (Tr. 151, 181-184.)  In April 1996, Dr. Snider

3  determined that Plaintiff most likely had viral irritant labyrinthitis.[2]  Tests by MRI and MRA

4  were negative.  (Tr. 182.)  In July 1996, Dr. Snider concluded that Plaintiff continued to

5  suffer from residual viral labyrinthitis, and opined that Plaintiff should not fly in the near

6  future.  (Tr. 181.)

7     Drs. Snider and Welsh referred Plaintiff to Dr. Coulthard, an Ear, Nose & Throat

8  specialist. (Tr. 172.) Dr. Coulthard conducted diagnostic tests on Plaintiff on July 17, 1996,

9  and diagnosed him with vertigo of unknown etiology. (Tr. 171.)  Dr. Coulthard noted that

10  Plaintiff had experienced chronic equilibrium dysfunction since March 23, 1996, that

11  Plaintiff's condition must be treated as permanent, and that Plaintiff should not fly. (Tr. 163.)

12  He recommended that Plaintiff avoid sudden movement and situations that might aggravate

13  the vertigo such as flying or using the simulator. (Tr. 144.)

14     On December 24, 1996, the Medical Review branch of the Aeromedical Certification

15  Division of the FAA denied Plaintiff's application for airman medical certification due to a

16  "disqualifying neurological condition." (Tr. 132.)  Plaintiff requested reconsideration of the

17  FAA's decision.  (Tr. 161.)  Dr.Warren S. Silberman, D.O., a Manager of the aeromedical

18  Certification Division of the Civil Aeromedical Institute at the U.S. Department of

19  Transportation for the FAA, reviewed Plaintiff's file and affirmed the December 24, 1996

20  denial of medical certification for flying.  Dr. Silberman referred Plaintiff to Dr. John H.

21  Seipel, Ph.D., M.D., J.D., a neurologist and lawyer specializing in aviation and aerospace

22  medicine. Dr. Seipel reviewed medical records and determined that Plaintiff had labyrinthitis

23  and that it may be permanent. (Tr. 145, 280.)  He further opined that Plaintiff should be

24  denied all classes of medical certification in the future. *(Id.)*

25     Plaintiff was referred to Dr. Jerald Olson, M.D., an otolaryngologist with University

26  Physicians, by Dr. Coulthard. (Tr. 139.) Dr. Olson opined that Plaintiff had viral labyrinthitis

27

28     [2]Labyrinthitis is an inflammation of the inner ear canal resulting in vertigo. *Mosby's Medical Dictionary* 880 (4th ed., Mosby 1994).

1   or neuronitis, but not paroxysmal positional vertigo. *(Id.)* Dr. Olson indicated that the

2   problem might be permanent. *(Id.)* He recommended platform posturography followed by

3   vestibular rehabilitation and future evaluation for improvement. *(Id.)*

4     Dr. Coulthard also referred Plaintiff to Kathy Nichols, P.T., a Balance Disorders

5   Clinic Coordinator at Healthsouth Rehabilitation Institute of Tucson. (Tr. 141.) Plaintiff

6   complained that he was having episodes 2-3 times per week where he felt he was turning left.

7   (Tr. 142.) A Posturography test was performed. (Tr. 141.) The results were substantially

8   normal, with a few minor deviations.  (Tr. 141.) Ms. Nichols  recommended that Plaintiff

9   engage in exercises that challenge the vestibular system.  (Tr. 141.)

10     Plaintiff's employer, United Airlines, referred Plaintiff to the Aviation Medicine

11   Center at the University of Texas Medical Branch at Galveston, where he was examined by

12   Drs. John Calverley, Jeffrey Vrabec, Bobby Alford and Clarence Jernigan.  (Tr. 184, 193.)

13   In addition, as part of the Aviation Medicine Center's examination of Plaintiff, Plaintiff was

14   examined by Beatriz C. Alvarado, M.A., an audiologist.  (Tr. 133.)  Audiology tests

15   disclosed mild, high-frequency sensorineural hearing loss in both ears. (Tr. 133.) Following

16   these examinations, Plaintiff's case was presented to the Aviation Medicine Board on March

17   4, 1997.  (Tr. 185.)  The Board opined that Plaintiff was experiencing benign paroxysmal

18   positional vertigo and was temporarily disabled from the performance of aircrew duties.  (Tr.

19   185.)  The Board recommended that Plaintiff undertake a series of repositioning exercises

20   and undergo re-testing in six months.  *(Id*.)  After additional treatments and examinations by

21   the doctors, Plaintiff's case was presented to the Board again in January, 1998. (Tr. 186-87.)

22   At that time, Plaintiff continued to have two or three mild episodes of vertigo per week. (Tr.

23   185.) He was diagnosed with post positional vertigo with a "definitive diagnosis impossible,"

24   although his symptoms were suggestive of phobic postural vertigo, which precluded him

25   from qualifying to perform aircraft flight crew duties. (Tr.187.)

26     A Physical Residual Functional Capacity Assessment completed on March 2, 1998,

27   concluded that Plaintiff had certain limitations:

28

Exertional limitations: Occasionally lifting 50 pounds, frequently lifting 25 pounds, standing and /or walking about 6 hours in an 8-hour workday, sitting about 6 hours in an 8-hour workday and unlimited pushing. (Tr. 201.)

Postural limitations: Never climbing or balancing.  Occasionally limited for stooping, kneeling, crouching and crawling. (Tr. 202.)
No limitations manipulatively, visually or communicatively. (Tr. 203-204.)

Environmental Limitations: avoid concentrated exposure to extreme cold and hazards. (Tr. 204.)

Dr. Phillip Kramer, a neurologist, examined Plaintiff in July of 1998 to render a "final" opinion for the Airline Pilot's Association and the United Airlines Medical Department regarding Plaintiff's episodic vertigo. (Tr. 251.) Dr. Kramer found that symptoms were "brought on or exacerbated by bending over, and rapid head movements" . . . but "NOT brought on or exacerbated by turning over in bed, getting up quickly, walking in the dark, uneven surfaces, elevators, escalators, rich and busy visual environments, loud noises, valsalva maneuvers, exercise, meals or not eating, heat or hot showers, swallowing, alcohol or caffeine." (Tr. 252 (emphasis in original.)) Dr. Kramer ruled out viral labyrinthitis/neuritis and benign paroxysmal positional vertigo. (Tr. 254-255.) He also determined that MS, migraine, epilepsy, perilymph fistula or Meniere's disease were not contributing factors. (Tr. 254.) He recommended further testing to determine a more accurate diagnosis. (Tr. 255-256.) Dr. Kramer determined that Plaintiff had microvascular compression with a reasonable degree of medical certainty. Dr. Kramer indicated that the condition can be treated with Tegretol, which Plaintiff found did relieve him of episodes of vertigo. However, the effects of the medication would prevent Plaintiff from flying. The condition is also treatable with brain surgery, but the surgery is controversial and Dr. Kramer opined that the risks outweighed the benefits. Dr. Kramer recommended Plaintiff not take Tegretol because "the microvascular symptoms [were] not sufficient to interfere with his life in any other way other than flying" and "the risk of taking Tegretol out weigh[ed] the benefits that he [would] receive." Dr. Kramer also indicated that the microvascular compression is a permanent condition. (Tr. 321.)

CLAIM EVALUATION

1    Social Security Administration (SSA) regulations require that disability claims be

2    evaluated pursuant to a five-step sequential process. 20 C.F.R. §§ 404.1520, 416.920; *Baxter*

3    *v. Sullivan*, 923 F.2d 1391, 1395 (9th Cir. 1991). The first step requires a determination of

4    whether the claimant is engaged in substantial gainful activity (SGA). 20 C.F.R. §§

5    404.1520(a)(4), 416.920(a)(4). If so, then the claimant is not disabled and benefits are denied.

6    *Id.*

7    If the claimant is not engaged in substantial gainful activity, the ALJ proceeds to step

8    two which requires a determination of whether the claimant has a "medically severe

9    impairment or combination of impairments." 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). In

10    making a determination at step two, the ALJ uses medical evidence to consider whether the

11    claimant's impairment more than minimally limits or restricts his or her "physical or mental

12    ability to do basic work activities." *Id.* If the ALJ concludes the impairment is not severe, the

13    claim is denied. *Id.*

14    Upon a finding of severity, the ALJ proceeds to step three which requires a

15    determination of whether the impairment meets or equals one of several listed impairments

16    that the Commissioner acknowledges are so severe as to preclude substantial gainful activity.

17    20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); 20 C.F.R. Pt. 404, Subpt. P, App. 1.  If the

18    claimant's impairment meets or equals one of the listed impairments, then the claimant is

19    presumed to be disabled, and no further inquiry is necessary. *Ramirez v. Shalala*, 8 F.3d

20    1449, 1452 (9th Cir. 1993). If the claimant's impairment does not meet or equal a listed

21    impairment, evaluation proceeds to the next step.

22    The fourth step requires the ALJ to consider whether the claimant has sufficient

23    residual functional capacity ("RFC") to perform past relevant work. 20 C.F.R. §§

24    404.1520(a)(4), 416.920(a)(4).  RFC is defined as that which an individual can still do

25    despite her limitations.  20 C.F.R. § 404.1545.  If the ALJ concludes the claimant has

26    sufficient RFC, then the claim is denied. *Id.*

27    If the claimant cannot perform any past work, then the ALJ must move to the fifth step

28    which requires consideration of the claimant's RFC to perform other substantial gainful work

in the national economy in view of claimant's age, education, and work experience. 20 C.F.R.
§§ 404.1520(a)(4); 416.920(a)(4).  In determining whether the claimant retains the ability to
perform other work, the ALJ may refer to the Medical Vocational Guidelines ("the grids")
promulgated by the SSA. *Desrosiers v. Secretary of Health and Human Services*, 846 F.2d
573, 576-577 (9th Cir. 1988). The grids categorize jobs according to their exertional
requirements such as sedentary work, light work, or medium work. *Tackett v. Apfel*, 180 F.3d
1094, 1101 (9th Cir. 1999). Based on the claimant's exertional ability, age, education, and
work experience, the grids indicate whether or not the claimant is disabled. *Id.* The grids are
a valid basis for denying claims where they completely and accurately describe the claimant's
abilities and limitations. *Id.* at 1101-02.

If the claimant has significant non-exertional limitations, the grids do not apply. *Penny
v. Sullivan*, 2 F.3d 953, 958-959 (9th Cir.1993). "Non-exertional limitations are limitations
that do not directly affect a claimant's strength." *Burkhart v. Bowen*, 856 F.2d 1335, 1340
(9th Cir.1988).  If significant non-exertional limitations prevent the claimant from
performing the full range of work in any exertional category, the ALJ must accept the
testimony of a vocational expert to deny the claim. *Id.* at 1341.

If a claimant has both exertional and nonexertional limitations, a vocational expert's
testimony will be used to establish the level of work the claimant is able to perform. The ALJ
must then apply the grids to the established level and is bound by the result dictated by the
grids. *Cooper v. Sullivan*, 880 F.2d 1152, 1157 (1989). Where application of the grids directs
a finding of disability, that finding must be accepted. This is so whether the impairment is
exertional or results from a combination of exertional and nonexertional limitations. *Id.*
"[F]or individuals of advanced age who can no longer perform vocationally relevant past
work and . . . who have only skills that are not readily transferable to a significant range of
semi-skilled or skilled work that is within the individual's functional capacity . . . the
limitations in vocational adaptability represented by functional restriction to light work
warrant a finding of disabled." 20 C.F.R. pt. 404, subpt. P, app. 2, 202.00(c).

<u>The ALJ's Findings</u>

- 9 -

1        At step one of the disability analysis, the ALJ found Plaintiff had not engaged in any

2   substantial gainful activity since his alleged onset date.  (Tr. 338.)  At step two, he found

3   Plaintiff had severe impairments: microvascular compression disorder and mild bilateral high

4   frequency sensorinureal hearing loss.  (Tr. 339.)  At step three, the ALJ found Plaintiff's

5   impairments did not meet or equal the criteria for any impairment found in the Listing of

6   Impairments, Appendix 1, Subpart P, of 20 C.F.R., Part 404.  (*Id.*)  The ALJ then analyzed

7   Plaintiff's residual functional capacity at step four.  *Id.*  He made the following finding:

8           Full range of exertional activity except as limited by minor episodes of vertigo
            on an irregular basis and need to avoid exposure to operating machinery
9           without a great deal of care.

10  (*Id.*)  The ALJ concluded that Plaintiff could return to his past relevant work as a state

11  senator.  (*Id.*)  In addition, at step five, the ALJ concluded that, considering the types of work

12  that Plaintiff is still functionally capable of performing in combination with his age,

13  education and work experience, Plaintiff could be expected to make a vocational adjustment

14  to work that exists in significant numbers in the national economy, such as telephone solicitor

15  and dispatcher.  (*Id.*)  Accordingly, the ALJ concluded that Plaintiff was not disabled.

16                                 STANDARD OF REVIEW

17       An individual is entitled to disability benefits if he or she demonstrates, through

18  medically acceptable clinical or laboratory standards, an inability to engage in substantial

19  gainful activity due to a physical or mental impairment that can be expected to last for a

20  continuous period of at least twelve months. 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). "[A]

21  claimant will be found disabled only if the impairment is so severe that, considering age,

22  education, and work experience, that person cannot engage in any other kind of substantial

23  gainful work which exists in the national economy." *Penny v. Sullivan*, 2 F.3d 953, 956 (9th

24  Cir. 1993) (quoting *Marcia v. Sullivan*, 900 F.2d 172, 174 (9th Cir. 1990)).

25       To establish a *prima facie* case of disability, the claimant must demonstrate an

26  inability to perform his or her former work. *Gallant v. Heckler*, 753 F.2d 1450, 1452 (9th Cir.

27  1984). Once the claimant meets that burden, the Commissioner must come forward with

28

substantial evidence establishing the claimant is not disabled. *Fife v. Heckler*, 767 F.2d 1427, 1429 (9th Cir. 1985).

The findings of the Commissioner are meant to be conclusive. 42 U.S.C. §§ 405(g), 1383(c)(3). The court may overturn the decision to deny benefits "only if it is not supported by substantial evidence or it is based on legal error." *Matney v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992) (citations omitted). The Commissioner's determination that a claimant is not disabled must be upheld if the Commissioner applied the proper legal standards and the record as a whole contains substantial evidence to support the decision. *Clem v. Sullivan*, 894 F.2d 328, 330 (9th Cir.1990) (citing *Desrosiers v. Secretary*, 846 F.2d 573, 575-76 (9th Cir. 1988)); *Delgado v. Heckler*, 722 F.2d 570, 572 (9th Cir. 1983)). Substantial evidence is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citation omitted); *Winans v. Bowen*, 853 F.2d 643, 644 (9th Cir. 1987). The standard is less than a "preponderance of the evidence" standard. *Matney*, 981 F.2d at 1019.

"[I]f the evidence can support either outcome, the court may not substitute its judgment for that of the ALJ." *Matney*, 981 F.2d at 1019 (citing *Richardson*, 402 U.S. at 400). When applying the substantial evidence standard, however, the court should not mechanically accept the Commissioner's findings but should review the record critically and thoroughly. *Day v. Weinberger*, 522 F.2d 1154 (9th Cir. 1975). Reviewing courts must consider the evidence that supports as well as detracts from the Commissioner's conclusion. *Id.* at 1156. A denial of benefits will be set aside if the Commissioner fails to apply proper legal standards in weighing the evidence even though the findings may be supported by substantial evidence. *Frost v. Barnhart*, 314 F.3d 359, 367 (9th Cir. 2002); *Benitez v. Califano*, 573 F.2d 653, 655 (9th Cir. 1978).

## DISCUSSION

Plaintiff presents three issues which challenge the Commisioner's analysis at steps four and five: (1) whether the finding that Plaintiff's service as State Senator is past relevant work is erroneous; (2) whether the conclusion that Plaintiff could perform as a state senator

given his residual functional capacity is erroneous; and (3) whether the finding that Plaintiff had transferable skills or the ability to perform other work is erroneous.

### 1. The characterization of Plaintiff's service as a State Senator as past relevant work was supported by substantial evidence

As noted above, the fourth step of the analysis requires the ALJ to consider whether the claimant has sufficient residual functional capacity ("RFC") to perform past relevant work. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). RFC is defined as that which an individual can still do despite her limitations. 20 C.F.R. § 404.1545. Past work is relevant if it was done within the last 15 years, lasted long enough to learn how to do it, and was substantial gainful activity. 20 C.F.R. § 416.965(a). Substantial gainful activity is defined as work that: (a) involves doing significant and productive physical or mental duties; and (b) is done (or intended) for pay or profit. 20 C.F.R. § 416.910. If the ALJ concludes the claimant has sufficient RFC, then the claim is denied. 20 C.F.R. § 404.1545. No further analysis is required.

Plaintiff agrees that his past work as a state senator was relevant because the work was performed in the last 15 years and lasted long enough to learn how to perform the work activity. However, he contends that his service as a state senator can not constitute substantial gainful activity because: (1) the payment he received for his services did not constitute income and (2) his service (and possibly all legislative service) can never constitute past relevant work.

The Commissioner's conclusion that Plaintiff's earnings constituted substantial gainful activity is supported by substantial evidence. Under the applicable regulations, if an employee's average monthly "countable earnings" exceed the Earnings Guidelines, the employee will be considered to be engaging in substantial gainful activity. 20 C.F.R. §404.1574(b)(2)(i)(2006). For the period of 1980-1989, the Guidelines establish the amount of $300 as the monthly average earnings demonstrating substantial gainful activity; for 1990-1999, the Guideline amount is $500. Plaintiff testified that he earned $6000.00 for the five to six months that he performed legislative functions from 1979 to 1990. Based on this

testimony, the Commissioner concluded that Plaintiff was paid on average at least $1,000 for each of the months that he served as a State Senator. (Tr. 5.)[3] Because Plaintiff's average monthly "countable earnings" for that time period exceed the Earnings Guidelines, the Commissioner did not err in concluding that Plaintiff was engaged in substantial gainful activity.

Plaintiff suggests that his work as a state senator was not substantial gainful employment because, although he was paid for his work, he did not perform the work for profit or income. According to Plaintiff, the unique circumstances associated with service in a political office are such that political service should never be considered past relevant work; it is community service with a stipend. Plaintiff states that he undertook legislative responsibilities due to his desire to serve the community and at a tremendous financial loss to his personal household. In addition, Plaintiff notes that he entered the political arena not for pay or profit but because of dissatisfaction with the representation in place and a belief that he could do better. Plaintiff thus concludes that the court should reject the conclusion that service and sacrifice in elected office could ever constitute past relevant work in the disability calculus because in obtaining such a position there is not an intent to engage in substantial activity for pay or profit. (Plaintiff's Memorandum at 6.)

It is undisputed that Plaintiff actually reduced the compensation he was capable of earning by choosing to serve part-time as a senator rather than working full-time flying commercial aircraft. The motivation of an individual to perform a job, however, is not considered in determining whether a job amounts to substantial gainful activity. Rather, the regulations require consideration of whether the work activity is "the kind of work usually done for pay or profit, whether profit is realized." 20 C.F.R. § 404.1572(b) (2004). There

---

[3]Plaintiff contends that his pay did not average more than $500 per month. Plaintiff asserts that his salary should be averaged over a 12-month period rather than over the five to six months that he worked as a senator. Even if Plaintiff's proposed method of calculation is utilized, however, Plaintiff's earnings as a state senator still equal or exceed the Earnings Guidelines for the relevant time periods.

1   are many vocations that people enter into because of a desire to serve their community or for
2   other altruistic reasons, but these admirable motives do not make the work any less
3   substantial for purposes of determining disability.  Because Plaintiff's work as a senator was
4   paid, it falls within the definition of substantial gainful activity.  Plaintiff's subjective
5   motivation is not a basis for finding that the Commissioner erred in concluding that
6   Plaintiff's work as a state legislator is the kind of work which is usually done for pay or
7   profit.

8          Second, Plaintiff asserts that the ALJ erroneously determined that Plaintiff could
9   return to his past relevant work as an elected State Senator. (Plaintiff's Memorandum at 3.)
10  The ALJ actually concluded that "claimant's impairments have not prevented him from
11  *performing* his past relevant work" and that "claimant's past relevant work as a State Senator
12  did not require the *performance* of work-related activities precluded by his residual
13  functional capacity." (Tr. 19 ¶ 8; Tr. 339 ¶ 7) (emphases added)).  The distinction between
14  a claimant's ability to *return to* or to *perform* PRW is an important one, because the focus of
15  the step four analysis is whether a person is capable of doing a job he has done in the past,
16  not whether he can obtain such a job.  The Supreme Court has held that whether the past
17  work even exists in the national economy is not an issue in the step four analysis.  *Barnhart*
18  *v. Thomas,* 540 U.S. 20, 28 (2003). The Court reasoned:  "Congress could have determined
19  that an analysis of a claimant's physical and mental capacity to do his previous work would
20  'in the vast majority of cases' serve as an effective and efficient administrative proxy for the
21  claimant's ability to do some work that exists in the national economy." *Id.*  Thus, the
22  step four analysis of a claimant's past work experience is not based on an assumption that
23  the claimant will (or could) return to that particular job. It is a test to determine whether the
24  claimant is capable of doing work of the type he knows how to do. Under the *Thomas*
25  "administrative proxy" interpretation of the step four analysis, the fact that the claimant is
26  capable of performing valuable work is what is relevant.

27         Plaintiff contends that the ALJ's finding that he could return to his previous work is
28  erroneous because he cannot withstand the rigors of campaigning. (Plaintiff's Memorandum

at 7.)  According to Plaintiff, his vertigo and dizziness would prohibit him from walking in rural areas and attending the numerous events associated with campaigning.  Given the *Thomas* reasoning, *supra*, this argument must be rejected.  As stated above, the analysis of a claimant's ability to perform past work is an administrative proxy that enables the ALJ to conclude that the claimant is capable of doing work.  It is not relevant whether the claimant would be hired or could get the job.  20 C.F.R. § 404.1566(b)(1), (3) and (7) (2006); 42 U.S.C. § 423(d)(2).  In the present case, Plaintiff's ability to campaign for a position is analogous to applying for work.  Thus, whether Plaintiff has the residual functional capacity to *campaign for* a position as state senator is irrelevant; the relevant inquiry is whether, following a successful campaign, Plaintiff has the residual functional capacity to perform the activity of state senator.  Plaintiff does not assert that he is unable to perform that activity.

The ALJ's decision to find that Plaintiff's work as State Senator constituted past relevant work was supported by substantial evidence and was not based on legal error. Because the ALJ found that Plaintiff could perform his past work, a finding that the Plaintiff was not disabled was appropriate.

Under the five-step evaluation process, if the Plaintiff is found not disabled at any step, the inquiry ends and an analysis of the next step is not required. 20 C.F.R. 404.1520. *See also Matthews v. Shalala*, 10 F.3d 678, 681 (9th Cir. 1993); *Crane v. Shalala*, 76 F.3d 251, 255 (9th Cir. 1996). Because the ALJ did not err in concluding that Plaintiff was not disabled at step four, a step five analysis was not necessary. Thus, the Court will not review the ALJ's alternative finding that Plaintiff could perform other work in the national economy. (Tr. 339.)

<u>RECOMMENDATION</u>

For the foregoing reasons, the Magistrate Judge recommends that the District Court, after its independent review, grant Defendant's Motion for Summary Judgment (Doc. No. 9), and deny Plaintiff's Motion for Summary Judgment.  (Doc. No. 8.) Pursuant to 28 U.S.C. § 636(b), any party may file and serve written objections within 10 days after being served with a copy of this Report and Recommendation. If objections are not timely filed, the

1  party's right to *de novo* review may be waived. *See United States v. Reyna-Tapia*, 328 F.3d

2  1114, 1121 (9th Cir. 2003) (*en banc*), *cert. denied*, 540 U.S. 900 (2003). If objections are

3  filed, the parties use the following case number: CV-00444-CKJ.

4  The Clerk of the Court is directed to send a copy of this Report and Recommendation

5  to all parties.

6  DATED this 27th day of July, 2007.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23  _____
    Jennifer C. Guerin
24  United States Magistrate Judge

25

26

27

28